IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:10-CV-14-D

| | |
|---|---|
| GEORGE COOPER, SR., and <br> GEORGE COOPER, JR., <br><br>              Plaintiffs, <br><br>      v. <br><br> BRUNSWICK COUNTY SHERIFF'S <br> DEPARTMENT, JAMES SHEEHAN, <br> BRIAN CARLISLE, RONALD HEWETT, <br> DAVID CROCKER, GENE CAISON, <br> KEVIN HOLDER, and JOHN INGRAM, <br><br>              Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )      **ORDER** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

On January 29, 2010, George Cooper, Sr. ("Cooper Sr.") and George Cooper, Jr. ("Cooper Jr.") filed a complaint asserting claims under federal and North Carolina law [D.E. 1]. The complaint arises from a shooting that took place in Brunswick County, North Carolina on May 2, 2007, and the events leading to the shooting are hotly contested. Plaintiffs sued the Brunswick County Sheriff's Department ("BCSD"), as well as several BCSD employees, in their individual and official capacities, including Deputy Sheriff James Sheehan ("Sheehan"), Deputy Sheriff Brian Carlisle ("Carlisle"), Sheriff John Ingram ("Ingram"), Deputy Sheriff David Crocker ("Crocker"), Deputy Sheriff Gene Caison ("Caison"), and Deputy Sheriff Kevin Holden ("Holden") (collectively, "defendants"). Plaintiffs also sued, in his official and individual capacities, the former Brunswick County sheriff, Ronald Hewett ("Hewett").[1] On April 2 and April 6, 2010, defendants and Hewett, respectively, filed answers [D.E. 13–14].

---

[1] Hewett proceeds separately from his co-defendants. Accordingly, references to "defendants" do not refer to Hewett.

On July 15, 2010, Cooper Sr. filed a motion for leave to file an amended complaint and a supporting memorandum [D.E. 24–25]. On November 3, 2010, the court referred Cooper Sr.'s motion for leave to amend the complaint to Magistrate Judge Daniel for disposition, and referred BCSD's motion to dismiss to Judge Daniel for a memorandum and recommendation ("M&R") [D.E. 33]. On February 7, 2011, Judge Daniel denied Cooper Sr.'s motion without prejudice and recommended that the court grant BCSD's motion to dismiss [D.E. 36]. No party timely objected to the M&R, and on February 23, 2011, the court adopted Judge Daniel's conclusions and dismissed plaintiffs' claims against BCSD [D.E. 37].

In the M&R, Judge Daniel noted that Cooper Sr. failed to comply with the proper procedure under North Carolina law for his appointment as a guardian to pursue the case on behalf of his son, Cooper Jr. See M&R 3–4 (collecting cases). Because Cooper Sr. never complied with North Carolina law and was never appointed to represent Cooper Jr. in the case, Cooper Sr. is the sole plaintiff.

On February 1, 2012, defendants filed a motion for summary judgment as to Cooper Sr.'s claims [D.E. 44–53]. Hewett also filed a motion for summary judgment as to Cooper Sr.'s claims against him [D.E. 54–55]. On March 7, 2012, Cooper Sr. responded in opposition to the motions for summary judgment [D.E. 58–60]. Thereafter, defendants and Hewett replied. As explained below, the court grants in part and denies in part summary judgment to defendants on the federal and state claims. Specifically, the court denies summary judgment as to Cooper Sr.'s federal claim against Sheehan and Carlisle under 42 U.S.C. § 1983 and the Fourth Amendment for unreasonable seizure and for some of Cooper Sr.'s state law claims against Sheehan and Carlisle for their use of force against Cooper Sr. The court grants summary judgment to the defendants and Hewett on all other claims.

I.

Cooper Sr. is fifty-seven years old and a resident of Leland, North Carolina. Cooper Dep.

[D.E. 47-8–10] 8, 13. Although he worked as a longshoreman, he has been unemployed since 2007. Id. 12–13. In May 2007, Cooper Sr. resided in a mobile home ("Cooper residence") located at 2403 Maco Road, Leland. Id. 14–15. Until sometime after May 2007, Cooper Sr.'s son, Cooper Jr., lived with him. Id. 16–17. In May 2007, Cooper Jr. was eight years old. Id. 16.

On May 2, 2007, Cooper Sr. spent most of the day repairing the floor of his aunt's house. Id. 48–50; see id., Ex. 9 ("Cooper SBI Statement") 1. Cooper Jr. and Cooper Sr.'s cousin, Paul Herring ("Herring"), assisted Cooper Sr. with this work. Cooper Dep. 48–50. Herring recently had moved to North Carolina from Connecticut. Id. 77. At the end of the day, Herring agreed to join Cooper Sr. and Cooper Jr. for dinner at the Cooper residence and stay the night. Id. 61, 77–78. On the way home, Cooper Sr. drove to a friend's residence and purchased some marijuana, id. 61–63, and then purchased alcohol at a store. Id. 63–65.

Cooper Sr., Cooper Jr., and Herring arrived at the Cooper residence around 9:00 p.m. Cooper Sr. and Herring stood outside in the yard, drinking alcohol, smoking marijuana, and talking loudly about "[f]ootball games, [and] old fights." Id. 69–71, 82. Before smoking the marijuana, Cooper Sr. laced the marijuana cigarette with powder cocaine that he stored in his residence. Id. 66, 72, 78. At this time, Cooper Jr. was at the nearby home of Cooper Sr.'s sister. Id. 70–71. While outside, Cooper Sr. smoked marijuana, consumed some powder cocaine, and drank three or four beers and a pint of brandy. Id. 72–75.

At some point, Cooper Sr. and Herring went inside the residence. Id. 78–79. Cooper Sr. went to the kitchen and prepared to grill pork chops and chicken. Id. When Cooper Sr. was in the kitchen, Cooper Jr. came home and went to his bedroom. Id. 79–80. Herring sat in the living room. Id. 79.

Around 11:30 p.m., Cooper Sr. heard a "banging on the side of the house." Id. 105; see id. 80, 98. Cooper Sr. thought that a relative was knocking on his window. Id. 83, 86, 116. Cooper Sr. peered out the back door (the Cooper residence's primary entrance), but did not see anyone. Id. 84.

3

Cooper Sr. asked that anyone outside identify himself, but received no response. Id. 83, 97, 117. Cooper Sr. decided to go outside to investigate the noise. See id. 92. Before going outside, Cooper Sr. picked up his twenty-gauge shotgun ("shotgun"), which was located near the door. See id. 92–93. According to Cooper Sr., the shotgun was not loaded. See id. 96, 141.

With the butt of the shotgun in his right hand and the barrel pointing down, Cooper Sr. opened the back door and took two or three steps on to his darkened porch. Id. 100–01. The porch is approximately eighteen inches above the ground. Id. 124. Cooper Sr. stood and called out, "Who is it?" Id. 101–02. Cooper Sr. heard no response. Id. There were no lights outside the Cooper mobile home, and Cooper Sr. could not see anyone. Id.; see id. 33–34. While on the porch, Cooper Sr. held the shotgun in his right hand with the barrel towards the floor and did not raise the shotgun. Id. 103.

The loud noise that Cooper Sr. heard was the sound of Sheehan striking a rear window of the Cooper residence with his flashlight. Sheehan Dep. [D.E. 47-2] 18–19; see Carlisle Dep. [D.E. 47-6–7] 23. On May 2, 2007, Sheehan and Carlisle were BCSD deputy sheriffs. Sheehan Dep. 13–14; Carlisle Dep. 15–16. Sheehan joined Carlisle in responding to a reported "disturbance" at the Cooper property, and each was in uniform. Sheehan Dep. 17; Carlisle Dep. 20.[2] The 911 dispatcher told Sheehan and Carlisle that it "[s]ounds like two males screaming at each other." Francisco Aff., Ex. 1 ("Dispatcher Recording 2"). With Carlisle driving a marked patrol car and Sheehan driving an "unmarked black Crown Victoria," the deputies drove to the Cooper property. Sheehan SBI Statement 4; see Carlisle Dep. 21; Sheehan Dep. 17–18.

---

[2] Cooper Sr.'s neighbor, Lyle Baroski ("Baroski"), called 911 to report that an altercation was occurring at the Cooper property. See Francisco Aff. [D.E. 53], Ex. 1 ("Dispatcher Recording 1"). Beyond reporting yelling, screaming and other sounds of a fight, Baroski stated that he was not certain whether the individuals at the Cooper property "were going to start shooting guns again or what." Id. 00:42–00:46. However, the record does not reflect that Sheehan and Carlisle received the additional details Baroski told the 911 dispatcher, including Baroski's reference to individuals "shooting guns again."

As Carlisle approached the Cooper property in his cruiser, he "could hear screaming . . . coming from this property." Carlisle Dep. 20. Carlisle saw "a black male standing on the back porch [of the Cooper residence] screaming into . . . the house" as he drove up. Id. 21–22. According to Carlisle, this individual observed the two vehicles before entering the Cooper residence. Id. 22. When Sheehan pulled his vehicle on to the Cooper property, he saw "a figure on the back porch get up and go inside the house." Sheehan Dep. 18. Sheehan also heard yelling inside the residence. Id.

Cooper Sr. denied that he saw the deputies arrive and testified that he was in the kitchen. Cooper Dep. 81–82. Both Sheehan and Carlisle agree that their vehicles' blue lights were not activated. See Sheehan Dep., Ex. 1 ("Sheehan SBI Statement") 4; Carlisle Dep. 22.

Sheehan and Carlisle parked their vehicles on the grass of the Cooper property, and approached the residence on foot. Sheehan Dep. 18; Carlisle Dep. 22–23. As they approached, Sheehan continued to hear a heated argument, but he could not discern any words. Sheehan Dep. 18. Carlisle also heard "screaming" and "people walking around inside the trailer." Carlisle Dep. 23. To alert the residence's occupants of his and Carlisle's presence, Sheehan "tapp[ed] on the window" with his flashlight. Sheehan Dep. 18–19; see Carlisle Dep. 23–24. But neither Sheehan nor Carlisle called out to identify themselves as sheriffs deputies. See Sheehan Dep. 18–19; Carlisle Dep., Ex. 1 ("Carlisle SBI Statement") 3, 7.

According to Sheehan, someone inside the Cooper residence responded to the tap by shouting obscenities. Sheehan Dep. 19. Cooper Sr. denied shouting obscenities, but admitted that he might have uttered obscenities when he first heard the loud noise and, due to the mobile home's thin walls, someone standing in the yard might have heard them. See Cooper Dep. 116–17. Sheehan and Carlisle then walked to the area of the Cooper property adjacent to the mobile home's back door (which was the main entrance) and approached the porch. Sheehan Dep. 18; Carlisle Dep. 25.

Cooper Sr. and deputies Sheehan and Carlisle present dramatically different accounts of the next few moments. In brief, they are as follows. According to Cooper Sr., he picked up the shotgun

5

that was inside the mobile home and near the door, stepped out the back door on to the porch holding the shotgun with the barrel facing down, called out "Who is it?", saw no one and heard nothing, stood there for two or three seconds, and then was shot multiple times. See Cooper Dep. 99–103. According to Sheehan, he stumbled over a concrete block within a few feet of the back porch steps, and while he was regaining his balance, the back door "flew open." Sheehan Dep. 20. Sheehan saw "red swirly flashes and . . . heard 'Boom.'" Id. Sheehan thought that he had been shot, or at least shot at, drew his service weapon, and returned fire. See id. According to Carlisle, he was a little further away from the porch than Sheehan when "the [back] door swung open and there was a black male holding a shotgun pointed to the ground." Carlisle Dep. 24. The person on the porch, later determined to be Cooper Sr., "raise[d] [the shotgun] up to his hip and fire[d] one time." Carlisle Dep. 25; see id. 41. Carlisle drew his service weapon and returned fire. See id. 25. Neither Sheehan nor Carlisle testified that Cooper Sr. said anything after he stepped on to the porch. Both Sheehan and Carlisle stated that Cooper Sr. was aiming the shotgun at Sheehan when he fired it. Sheehan SBI Statement 4–5; Carlisle SBI Statement 4. Cooper Sr. denies firing the shotgun. Cooper Dep. 140–41.

Carlisle quickly discharged his firearm at Cooper Sr. six or seven times. Carlisle Dep. 39. Sheehan quickly fired "five to seven rounds." Sheehan SBI Statement 4. Cooper Sr. felt two bullets hit his body, then he turned around and tried to reenter the residence. Cooper Dep. 112. Sheehan and Carlisle each saw Cooper Sr. turn around. Sheehan Dep. 20; Carlisle Dep. 25. Sheehan stopped discharging his firearm after Cooper Sr. turned around. Sheehan Dep. 20. Carlisle noted that Cooper Sr. continued to hold the shotgun in his right hand as he attempted to reenter the residence. Carlisle Dep. 25. Carlisle did not state whether he continued to discharge his firearm at Cooper Sr. after Cooper Sr. turned away, but Cooper Sr. reported "getting shot a couple of more times" after he turned around. Cooper Dep. 112. Cooper Sr. was shot five or six times, incurring wounds in the elbow, ankle, back, buttocks, and stomach. Id. Cooper Sr. then fell to the floor. Id.

6

After Cooper Sr. fell to the floor, Carlisle stepped on to the porch. Carlisle Dep. 25–26; see Sheehan Dep. 21. Carlisle "grabbed the shotgun from [Cooper Sr.] and threw it to the side of where the porch was." Carlisle Dep. 26; see Sheehan Dep. 21.

Both Sheehan and Carlisle immediately radioed for emergency medical assistance. Sheehan Dep. 21; Carlisle Dep. 28; see Sheehan SBI Statement 5; Carlisle SBI Statement 6; see also Francisco Aff., Ex. 1 ("Dispatcher Recording 6") 00:29–00:33 ("Subject . . . with a shotgun. Shots fired at me."). As Carlisle stood over the now unconscious Cooper Sr., Carlisle noticed that Cooper Jr. "kept peeking his head around the door." Carlisle Dep. 27. Carlisle asked Cooper Jr. if anyone else was in the residence. Carlisle SBI Statement 5. Cooper Jr. responded falsely that there was no one else inside. Id. Cooper Jr. also repeatedly volunteered to Carlisle that there were no drugs in the residence. Carlisle Dep. 27; see Carlisle SBI Statement 6.

Carlisle immediately entered the Cooper residence, where he saw Herring sitting in the living room. Carlisle Dep. 27; see Carlisle SBI Statement 5. Carlisle ordered Herring to raise his hands. Carlisle Dep. 27; see Carlisle SBI Statement 5. Herring complied and asked what was happening. See Carlisle Dep. 27. Carlisle informed Herring that "his buddy just pointed a gun and shot at [Carlisle's] partner." Carlisle SBI Statement 6. Carlisle told Herring and Cooper Jr. to go outside with Sheehan and then searched the Cooper residence for additional occupants and found none. See Carlisle Dep. 27–28; Sheehan Dep. 21–22.

Outside, Sheehan patted Herring down for weapons, then told Herring to sit down in the yard. Sheehan SBI Statement 6. Herring complied. Id. After Sheehan recovered from the shock of the situation and gave instructions to Cooper Jr. and Herring about where to sit, Sheehan sat in his vehicle "until the SBI got there and told [him] to come out." Sheehan Dep. 24; see Sheehan SBI Statement 5. After Carlisle finished searching the Cooper residence, Carlisle also returned to his vehicle. Carlisle Dep. 29.

Shortly after the shooting, BCSD Deputy Sheriff David Frye ("Frye") arrived. See Sheehan

7

Dep. 24; Carlisle Dep. 32. Frye instructed Sheehan and Carlisle to remain in their vehicles and to each write a statement describing the events. Sheehan Dep. 24; Carlisle Dep. 32. Sheehan and Carlisle followed Frye's instructions. Sheehan Dep. 24; Carlisle Dep. 32. Emergency medical responders arrived shortly after Frye. Sheehan Dep. 24; Carlisle Dep. 32–33. Medical responders loaded Cooper Sr. into an ambulance and transported him to a local hospital. Carlisle Dep. 33. They also examined Sheehan for injuries and found none. Sheehan Dep. 24.

About one hour after the shooting, Hewett, the then-sheriff of Brunswick County, arrived at the scene. Carlisle Dep. 33, 44; see Sheehan Dep. 24–25. After learning of the events but before traveling there, Hewett telephoned Crocker and Caison. Crocker Dep. [D.E. 47-3] 11; Caison Dep. [D.E. 47-4] 12. On May 2, 2007, Crocker was a BCSD lieutenant, Caison Dep. 12, and Caison was his supervisor. Id. Hewett informed Crocker and Caison that BCSD was responsible for investigating the shooting, and that they should not allow SBI investigators to interfere. Crocker Dep. 11; Caison Dep. 12. However, District Attorney Rex Gore then contacted Caison and ordered him "to secure the crime scene and wait for the SBI to get there." Caison Dep. 13; see Crocker Dep. 11. Crocker and Caison arrived at the Cooper residence shortly thereafter and encountered Hewett, SBI investigators, and other law enforcement officers. Crocker Dep. 10; Caison Dep. 14.

After arriving, Hewett told Sheehan and Carlisle to describe the evening's events to SBI investigators. See Sheehan Dep. 24–25; Carlisle Dep. 33–34. Sheehan and Carlisle did so. Sheehan Dep. 26; Carlisle Dep. 33–35; see Sheehan SBI Statement; Carlisle SBI Statement. Hewett did not instruct Sheehan or Carlisle about what to tell the SBI. See Carlisle Dep. 45; Sheehan Dep. 25. At the Cooper property, Sheehan spoke to a SBI investigator, allowed the investigator to inspect Sheehan's body, and relinquished his firearm to the investigator. Sheehan Dep. 26. Sheehan then traveled to BCSD headquarters, where he gave an additional statement to the SBI investigator. Id. Carlisle also left the Cooper property shortly after relinquishing his weapon and speaking to a SBI investigator. See Carlisle Dep. 34–37.

8

Meanwhile, Crocker and Caison inspected the Cooper property. See Crocker Dep. 11; Caison Dep. 14. Caison discovered several pistol casings and a shotgun shell lying on the ground. Caison Dep. 15–16. However, Caison found the shotgun shell approximately twenty-six feet from the mobile home's porch. Id. 16. Crocker noticed the shotgun lying on the ground near the residence, but did not touch the shotgun and did not otherwise determine whether it was loaded. Crocker Dep. 12–13. Caison also saw the shotgun lying on the ground, and denied touching it. Caison Dep. 18–19.

After Crocker and Caison finished their investigations, Hewett instructed them to go to BCSD headquarters and draft a press release describing the events that occurred at the Cooper residence. Crocker Dep. 13; see Caison Dep. 17–18. Crocker and Caison then traveled to BCSD headquarters and met in Crocker's office. Crocker Dep. 13; Caison Dep. 20–21, 25. Holden, a BCSD captain who oversaw the jail, joined them there. Crocker Dep. 13; see Holden Dep. [D.E. 47-1] 8–10. Crocker then received and answered a telephone call from Hewett. Crocker Dep. 14; Caison Dep. 25; Holden Dep. 11. Caison recorded the ensuing conversation with Crocker's and Holden's knowledge. Crocker Dep. 14; Caison Dep. 25. Caison recorded the conversation because, at that time, Caison was assisting SBI investigators and the United States Attorney's Office with a wholly unrelated criminal investigation of Hewett. Caison Dep. 26–27.

During the conversation, Hewett informed Crocker, Caison, and Holden that SBI investigators did not find a shotgun shell in the shotgun, which might suggest that Cooper Sr. did not discharge the shotgun at Sheehan. See Crocker Dep., Ex. 1 ("May 3, 2007 Transcript") 1–2. Hewett expressed frustration with the SBI's investigation of the events at the Cooper residence. Id. 2–3. Hewett then instructed Crocker, Caison, and Holden to prepare a press release stating that Cooper Sr. "leveled" the shotgun at Sheehan. Id. Hewett also stated that the press release should include "whatever is legal." Id. According to Crocker, Hewett was "in an agitated state." Crocker Dep. 24; see id., Ex. 2 ("Crocker Aff.") ¶ 9. However, Hewett never instructed Crocker, Caison, and

9

Holden to affirmatively state in the press release that Cooper Sr. discharged the shotgun at Sheehan. See May 3, 2007 Transcript; see also Holden Dep. 17.

Crocker then drafted a press release. Crocker Dep. 26; see Cooper Dep., Ex. 5 ("News Release"). The press release states that after "two uniform officers . . . knocked on the window" of the Cooper residence, Cooper Sr. "stepped out on the back porch . . . armed with a shotgun, . . . which he leveled . . . at the officers." News Release 1. On May 3, 2007, Hewett held a press conference during which he read from the press release that Crocker drafted. Crocker Dep. 26.

On May 3, 2007, Sheehan and Carlisle were placed on paid administrative leave, but returned to active service within a few days. See Sheehan Dep. 29. When they were deposed on October 20, 2010, both Sheehan and Carlisle remained BCSD deputy sheriffs. See Sheehan Dep. 6; Carlisle Dep. 40. When Caison was deposed on October 22, 2010, he was a BCSD captain overseeing narcotics investigations and performing administrative tasks. Caison Dep. 11. In December 2007, Crocker retired from BCSD. See Crocker Dep. 8.

On July 9, 2007, a state grand jury indicted Cooper Sr. and charged him with two counts of assaulting a law enforcement officer. See Crocker Aff. ¶ 2; Cooper Dep. 19–20, 141–42. Before issuing the indictment, the grand jury heard testimony from Crocker regarding the events of May 2, 2007. See Crocker Aff. ¶¶ 2–3.

On March 27, 2008, state prosecutors suspended Hewett from office. Hewett's suspension resulted from federal and state investigations into Hewett's misconduct and malfeasance wholly unrelated to the Cooper case. See Crocker Dep. 35–46; Caison Dep. 34–78; Holden Dep. 14–17; see also Crocker Aff. ¶¶ 1–17; Caison Dep., Ex. 2 ("Caison Aff.") ¶¶ 1–22; Holden Dep., Ex. 6 ("Holden Aff.") ¶¶ 1–7. Crocker, Caison, and Holden actively assisted with the investigations of Hewett. See Crocker Aff. ¶¶ 1–17; Caison Aff. ¶¶ 1–22; Holden Aff. ¶¶ 1–7.

On April 15, 2008, Hewett resigned. See Compl. ¶ 58; Defs.' Answer ¶ 58, Def. Hewett's Answer [D.E. 14] ¶ 58; see also Caison Dep. 77. On May 19, 2008, Ingram became sheriff. See

10

Compl. ¶ 9; Defs.' Answer ¶ 9; Def. Hewett's Answer ¶ 9. In June 2008, Hewett pleaded guilty to federal and state charges related to embezzlement and obstructing the investigation of his own conduct and was incarcerated. See Compl. ¶ 58; Defs.' Answer ¶ 58; Def. Hewett's Answer ¶ 58.

On January 29, 2010, Cooper Sr. filed suit seeking compensatory and punitive damages. See Compl. Cooper Sr. asserted eighteen claims, some under federal law and some under North Carolina law. Id. ¶¶ 63–179. As for Cooper Sr.'s federal claims, he asserts claims under 42 U.S.C. § 1983 against Sheehan and Carlisle alleging that Sheehan and Carlisle, acting under color of state law, violated his rights secured by the Fourth and Fourteenth Amendments of the United States Constitution. See Compl. ¶¶ 63–79, 112–19, 120–24, 135–44, 147–52. Cooper Sr. also asserts a claim under section 1983 against Ingram, in his official capacity, alleging that the sheriff of Brunswick County knowingly failed to adequately train or supervise his deputy sheriffs and that this failure establishes the sheriff's deliberate indifference to Cooper Sr.'s federal constitutional rights. Compl. ¶¶ 80–90. Cooper Sr. also apparently asserts the same claim against Hewett in his official and individual capacities. See Compl. ¶¶ 9–15.[3] Finally, Cooper Sr. asserts claims under 42 U.S.C. § 1981 against Sheehan and Carlisle alleging that Sheehan and Carlisle, acting under color of state law, violated Cooper Sr.'s rights secured by the Fourth and Fourteenth Amendments, and were motivated by racial animus in doing so. See Compl. ¶¶ 112–19, 147–52.[4]

As for Cooper Sr.'s claims under North Carolina law, he asserts claims for assault, battery, and negligence against Sheehan, Carlisle, and Ingram. Id. ¶¶ 91–100. Next, Cooper Sr. asserts a claim for negligent supervision against Ingram in his official capacity and against Hewett in his individual capacity. Id. ¶¶ 101–06. Cooper Sr. also asserts claims under article I, section 20 of the

---

[3] Cooper Sr. does not explicitly state that he brings these claims under section 1983. See Compl. ¶¶ 80–90. However, section 1983 is the only possible basis for this claim. See City of Canton v. Harris, 489 U.S. 378, 388 (1989); Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999).

[4] Cooper Sr. does not assert federal claims against Caison, Crocker, and Holden. See [D.E. 58] 23.

11

North Carolina Constitution against Sheehan, Carlisle, and Ingram.  Id. ¶¶ 107–09, 125–29. Additionally, Cooper Sr. asserts claims for invasion of privacy against Sheehan, Carlisle, and Ingram.  Id. ¶¶ 130–34.  Cooper Sr. asserts claims for trespass to real property against Sheehan and Carlisle.  Id. ¶¶ 153–56.  Cooper Sr. asserts claims for gross negligence against Sheehan, Carlisle, and Ingram.  Id. ¶¶ 157–63.  Cooper Sr. asserts claims for trespass to personal property against Sheehan, Carlisle, and Ingram.  Id. ¶¶ 164–70.  Finally, Cooper Sr. asserts a claim against each defendant, other than Ingram, for civil conspiracy, arising from an alleged civil conspiracy to allow Crocker to present erroneous information to the state grand jury which resulted in Cooper Sr.'s indictment.  Id. ¶¶ 177–79.  Cooper Sr. seeks compensatory and punitive damages under North Carolina law.

## II.

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).  The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 325.  After the moving party has met this burden, the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis and quotation omitted).  A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248.  The court views the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).

## A.

Cooper Sr. asserts claims against Sheehan and Carlisle under 42 U.S.C. § 1983.  See Compl.

12

¶¶ 63–79, 112–19, 120–24, 135–44, 147–52.[5] "To [establish] a claim under [section] 1983, a plaintiff must [prove] the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988); see Filarsky v. Delia, 132 S. Ct. 1657, 1661–62 (2012); Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009). Additionally, a section 1983 plaintiff must prove the personal involvement of a defendant in causing the plaintiff's injuries. See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009); Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691–92 (1978); Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985).

Initially, defendants assert that qualified immunity protects Sheehan and Carlisle from section 1983 liability. See Defs.' Mem. Supp. Mot. Summ. J. Fed. Claims 14–24. Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012); Brandon v. Holt, 469 U.S. 464, 472–73 (1985). Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986); see Reichle, 132 S. Ct. at 2093; Messerschmidt v. Millender, 132 S. Ct. 1235, 1244 (2012); Ashcroft v. al-Kidd, 131 S. Ct.

---

[5] Cooper Sr.'s complaint also mentions 42 U.S.C. § 1981. Section 1981 protects the rights of "[a]ll persons within the jurisdiction of the United States [to] have the same right in every State . . . to make and enforce contracts . . . , and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. § 1981(a). "A [section] 1981 action . . . must be founded on purposeful, racially discriminatory actions that affect at least one of the contractual aspects listed in [section] 1981(b)." Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1018 (4th Cir. 1999). These "contractual aspects" include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Thus, to establish a claim under section 1981, a plaintiff must prove race discrimination concerning one of the statutorily enumerated contract rights in section 1981. See Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, 476–77 (2006); Spriggs, 165 F.3d at 1018. Here, Cooper Sr.'s claims do not concern the contractual rights referred to in section 1981. Thus, any section 1981 claim fails. See McDonald, 546 U.S. at 476–77.

2074, 2085 (2011); Pearson v. Callahan, 555 U.S. 223, 231–32 (2009). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." Waterman v. Batton, 393 F.3d 471, 476 (4th Cir. 2005); Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir. 1992). "Whether an official protected by qualified immunity may be held personally liable for an alleged unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken." Messerschmidt, 132 S. Ct. at 1244 (quotation omitted). "A police officer should prevail on an assertion of qualified immunity if a reasonable officer possessing the same information could have believed that his conduct was lawful." Slattery v. Rizzo, 939 F.2d 213, 216 (4th Cir. 1991) (emphasis omitted); see Messerschmidt, 132 S. Ct. at 1248; Pearson, 555 U.S. at 231.

When evaluating an assertion of qualified immunity, a court must "identify the specific right that the plaintiff asserts was infringed by the challenged conduct." Wilson v. Layne, 141 F.3d 111, 114 (4th Cir. 1998) (en banc), aff'd, 526 U.S. 603 (1999); see Adams v. Trs. of the Univ. of N.C.-Wilmington, 640 F.3d 550, 565 n.9 (4th Cir. 2011). Then, a court must ask two questions to determine whether qualified immunity applies. See Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 232; Brockington v. Boykins, 637 F.3d 503, 506 (4th Cir. 2011); Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs., 597 F.3d 163, 169 (4th Cir. 2010); Bostic v. Rodriguez, 667 F. Supp. 2d 591, 605–06 (E.D.N.C. 2009). First, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right." Pearson, 555 U.S. at 232. Second, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. A court may answer either of these questions first. Id. at 236; see Reichle, 132 S. Ct. at 2093; al-Kidd, 131 S. Ct. at 2080. A defendant is entitled to qualified immunity if the answer to either question is "no." Reichle, 132 S. Ct. at 2093; Pearson, 555 U.S. at 236.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Reichle, 132 S. Ct. at 2093

14

(quotations and alteration omitted); see al-Kidd, 131 S. Ct. at 2083; Anderson v. Creighton, 483 U.S. 635, 640 (1987); Estate of Cloaninger v. McDevitt, 555 F.3d 324, 331 (4th Cir. 2009). Although a plaintiff may allege that a right was clearly established without citing "a case directly on point, . . . existing precedent must have placed the statutory or constitutional question beyond debate." al-Kidd, 131 S. Ct. at 2083; see Reichle, 132 S. Ct. at 2093; see also Wilson, 141 F.3d at 114. The "'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Reichle, 132 S. Ct. at 2093 (quotations omitted). "The law is clearly established such that an officer's conduct transgresses a bright line when the law has been authoritatively decided by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the State." Wilson, 141 F.3d at 114; cf. Reichle, 132 S. Ct. at 2094 (assuming without deciding that controlling federal court of appeals authority could be a dispositive source of clearly established law within a given circuit); Hope v. Pelzer, 536 U.S. 730, 741–42 (2002) (concluding that binding circuit precedent, a state agency regulation, and a Justice Department report combined to create clearly established law).

1.

Cooper Sr. alleges that Sheehan and Carlisle violated his Fourth Amendment right to be free from unreasonable seizures. See Compl. ¶¶ 66–70, 121–22, 137, 143, 150. Specifically, Cooper Sr. alleges that Sheehan and Carlisle unreasonably seized him when Sheehan and Carlisle shot him. See id. ¶¶ 135–46; Pls.' Mem. Opp'n Defs.' Mot. Summ. J. Fed. Claims 11–18.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV. "The Fourth Amendment prohibition on unreasonable seizures bars police officers from using excessive force to seize a free citizen." Jones v. Buchanan, 325 F.3d 520, 527 (4th Cir. 2003); see Bailey v. Kennedy, 349 F.3d 731, 743 (4th Cir. 2003). A police officer violates the Fourth Amendment when he uses force against an

15

individual in an objectively unreasonable manner. See Scott, 550 U.S. at 381–86; Schultz v. Braga, 455 F.3d 470, 477 (4th Cir. 2006); Clem v. Corbeau, 284 F.3d 543, 550 (4th Cir. 2002). The use of deadly force is examined "from the perspective of a reasonable officer on the scene," Graham v. Connor, 490 U.S. 386, 396 (1989), as of "the moment that the force [was] employed," Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc), and under "the totality of the circumstances." Clem, 284 F.3d at 550 (quotation and alteration omitted). The court also is "guided by the pragmatic considerations of the moment and not by those that can be hypothesized from an armchair." Sigman v. Town of Chapel Hill, 161 F.3d 782, 787 (4th Cir. 1998); see Graham, 490 U.S. at 396.

"Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham, 490 U.S. at 396 (quotations omitted); see Waterman, 393 F.3d at 476. Among the factors that a court considers when assessing the reasonableness of a law enforcement officer's decision to use deadly force is "whether the suspect pose[d] an immediate threat to the safety of the officers or others." Graham, 490 U.S. at 396. "[I]f the suspect threatens the officer with a weapon . . . deadly force may be used . . . if, where feasible, some warning has been given." Garner, 471 U.S. at 11–12; see Schultz, 455 F.3d at 477. However, the use of deadly force against an individual who "poses no immediate threat to the officer and no threat to others" is not reasonable. Garner, 471 U.S. at 11; see Clem, 284 F.3d at 550.

The court analyzes Cooper Sr.'s Fourth Amendment seizure claim against the backdrop of the summary judgment standard. See Scott, 550 U.S. at 380–81. The court has recounted the disputed facts at length and will not repeat that discussion. Viewing the evidence in the light most favorable to Cooper Sr., the court cannot conclude that Sheehan and Carlisle are entitled to qualified immunity as a matter of law as to this claim. Genuine, material factual disputes remain about the events at the Cooper residence on May 2, 2007. A jury's resolution of these highly contested factual

issues will determine whether Sheehan and Carlisle used deadly force reasonably and, by extension, whether they are entitled to qualified immunity. Moreover, unlike in <u>Scott</u>, there is not a videotape of the disputed events. See <u>Scott</u>, 550 U.S. at 380–81.

In analyzing qualified immunity, the parties discuss <u>Pena v. Porter</u>, 316 F. App'x 303 (4th Cir. 2009) (unpublished). In <u>Pena</u>, the district court and the Fourth Circuit analyzed qualified immunity in the context of a motion for summary judgment. In <u>Pena</u>, the defendants, two police officers, knocked on the door of plaintiff's trailer at approximately 10:30 p.m. because defendants suspected that plaintiff was harboring a probation absconder. <u>Id.</u> at 307. Plaintiff, who was asleep, woke up upon hearing his dogs barking. <u>Id.</u> Plaintiff then opened the door holding a rifle, pointed towards the ground. <u>Id.</u> Plaintiff contended that he did not know that police officers were at his door, that defendants never identified themselves, and that he carried the rifle because he believed that "a fox or other predator was raiding his chicken coops." <u>Id.</u> When plaintiff stepped on to his trailer's porch, one defendant-officer, observing plaintiff holding a rifle, immediately fired two shots that both struck plaintiff. <u>Id.</u> Neither officer gave any warning before shooting plaintiff. <u>Id.</u> As a result of the first two shots, plaintiff fell on the floor. <u>Id.</u> Both defendant-officers then "fired an additional fourteen shots into the trailer." <u>Id.</u> Plaintiff sued, alleging that defendants' use of deadly force against him violated the Fourth Amendment. <u>Id.</u> at 308.

Viewing the evidence in the light most favorable to plaintiff, the Fourth Circuit affirmed the district court's denial of defendants' motion for summary judgment based on qualified immunity. <u>Id.</u> at 311–13. The Fourth Circuit rejected defendants' argument that plaintiff's possessing a deadly weapon in defendants' presence justified defendants' actions. <u>Id.</u> at 311 ("[P]olice do not have the unfettered authority to shoot any member of the public carrying a gun or other weapon."). The Fourth Circuit distinguished <u>Pena</u> from numerous other Fourth Circuit cases in which it affirmed law enforcement officers' uses of deadly force against individuals possessing deadly weapons by noting that defendants "had no probable cause to believe that [plaintiff] was dangerous other than the fact

17

that he possessed a weapon." Id. The Fourth Circuit also noted that plaintiff had a "perfectly reasonable" rationale for holding the rifle and that this "should have been apparent to [defendants] at the time of the shooting." Id. at 312. Because defendants did not identify themselves as law enforcement officers before plaintiff stepped on to the porch, the Fourth Circuit determined that it was unreasonable for defendants to conclude that plaintiff's "decision to arm himself was a sign of hostility to police." Id. at 312 n.8.

Pena supports Cooper Sr.'s argument. Accepting Cooper Sr.'s account as true, the totality of the circumstances does not establish that Sheehan and Carlisle had probable cause to believe that Cooper Sr. was dangerous when Cooper Sr. stepped onto his unlit porch at 11:30 p.m., holding a shotgun pointing down, asked who was there, heard nothing, and then was shot a few seconds later. Notably, before arriving at the Cooper residence, Sheehan and Carlisle learned from dispatch only that there was a "disturbance" at the residence with two males shouting. See Dispatcher Recording 2; Sheehan Dep. 17; Carlisle Dep. 20. The record does not reveal that the dispatcher mentioned a firearm or that Cooper Sr. had a violent criminal history. Likewise, the record does not reveal that the two deputies had any prior experience with Cooper Sr. or the residence.

Similarly, accepting Cooper Sr.'s version of events as true, no reasonable officer would have expected Cooper Sr. to know that two sheriff deputies were outside his residence. Cooper Sr. remained inside and did not see or hear Sheehan and Carlisle arrive at the residence, see Cooper Dep. 81–82, rendering null the facts that Sheehan and Carlisle were in uniform, that Carlisle drove a marked cruiser, and that someone on the porch allegedly saw them arrive. See Sheehan Dep. 13; Carlisle Dep. 22. Sheehan and Carlisle also admit that they did not activate their blue lights when responding to the call. See Sheehan SBI Statement 4; Carlisle Dep. 22. Moreover, the deputies did not speak to Cooper Sr. or otherwise identify themselves as deputies before shooting Cooper Sr. See Sheehan Dep. 18–19; Carlisle SBI Statement 3, 7. Furthermore, Sheehan's tap on the window was not an unambiguous signal of law enforcement presence. See Kentucky v. King, 131 S. Ct. 1849,

18

1861 (2011) ("[U]nless police officers identify themselves loudly enough, occupants may not know who is at their doorstep.").

An individual's angry and profane response to a law enforcement officer may factor into the officer's conclusion that the individual poses a threat of physical harm. See, e.g., Abdul-Khaliq v. City of Newark, 275 F. App'x 517, 521 (6th Cir. 2008) (unpublished); but cf. Jones v. Buchanan, 325 F.3d 520, 530 (4th Cir. 2003) (mere use of foul language in police presence does not create an immediate safety threat). Here, Sheehan claims to have heard cursing from inside the residence after he tapped on the window. See Sheehan Dep. 18–19. Cooper Sr. admits that he may have profanely asked who was tapping on the side of his residence. See Cooper Dep. 116–17. But, viewing the evidence most favorably to Cooper Sr., it was not reasonable for Sheehan to conclude that Cooper Sr.'s profanity was directed at him, as a law enforcement officer, and constituted a threat because Sheehan and Carlisle never clearly informed Cooper Sr. that two sheriff deputies were outside.

If Cooper Sr. had disobeyed police commands or stepped onto a dark porch armed despite knowing law enforcement officers were approaching his door, that certainly could affect a reasonable officer's apprehension of dangerousness. See Ingle v. Yelton, 264 F. App'x 336, 340–41 (4th Cir. 2008) (per curiam) (unpublished); Sigman, 161 F.3d at 787, Elliott, 99 F.3d at 642–43. Yet, as in Pena, viewing the evidence in the light most favorable to Cooper Sr., no reasonable officer could have believed that Cooper Sr. was aware that two sheriff deputies were outside when he stepped on to his dark, back porch at 11:30 p.m. holding his shotgun pointing at the ground. See Pena, 316 F. App'x at 312. Thus, no reasonable officer could have believed that Cooper Sr.'s mere decision to carry a firearm on to his porch when responding to an unknown, loud tap on his residence late at night in a dark, rural area "was a sign of hostility to the police." Pena, 316 F. App'x at 312 n.8.

Assuming the truth of Cooper Sr.'s account, Cooper Sr. stepped outside holding the shotgun butt in his right hand and the barrel facing down. See Cooper Dep. 103–04. Cooper Sr. did not raise

19

or fire the shotgun. See id. 103.[6] Absent a threatening act like raising or firing the shotgun, no reasonable officer could have believed that Cooper Sr. posed an immediate threat to their safety at "the moment that the force [was] employed." Henry, 652 F.3d at 531. Moreover, viewing the evidence in the light most favorable to Cooper Sr., it was "feasible" for Sheehan or Carlisle to give Cooper Sr. "some warning" before they used deadly force against him. Garner, 471 U.S. at 11. According to Cooper Sr., when he stepped on the porch, he asked, "Who is it?" and got no response for two or three seconds and then was shot. See Cooper Dep. 99–103.

Viewing the evidence in the light most favorable to Cooper Sr., a reasonable jury could find that Sheehan's and Carlisle's use of deadly force was not objectively reasonable. See, e.g., Graham, 490 U.S. at 397. Furthermore, Cooper Sr.'s Fourth Amendment right to remain free from the unreasonable use of deadly force by the police was clearly established by the Supreme Court. See Garner, 471 U.S. at 11–12 (holding that absent probable cause of "a threat of serious bodily harm," police may not employ deadly force against a suspect); Henry, 652 F.3d at 536 (holding that the "prohibition against shooting suspects who pose no significant threat of death or serious physical injury to the officer" was clearly established by Garner in 1985); Pena, 316 F. App'x at 312 (observing that the same Fourth Amendment right that Cooper Sr. asserts "is amply established by past decisions of both the Supreme Court and this court"). Moreover, "a jury could reasonably find

---

[6] For purposes of summary judgment, the court assumes that Cooper Sr. did not raise or fire the shotgun. Nonetheless, the court notes the conflict in the evidence concerning whether Cooper Sr. raised and fired the shotgun. For example, Carlisle and Sheehan both testified that Cooper Sr. raised and fired the shotgun, and Sheehan's excited utterance requesting emergency assistance bolsters this conclusion. See Francisco Aff., Ex. 1 ("Dispatcher Recording 7"). Crocker and Caison also both testified that their investigation led them to believe that the shotgun was loaded when Cooper Sr. stepped on to the porch and that Cooper Sr. fired the shotgun. See Crocker Dep. 27; Caison Dep. 28–29, 32–33. Moreover, SBI investigators found wadding from a shotgun shell "[d]irectly behind where Sheehan was standing" in the yard when Cooper Sr. allegedly fired the shotgun. Crocker Dep. 50. The presence of wadding suggests that someone at the Cooper property fired a shotgun near the porch at some point. Finally, shortly after May 2, 2007, Cooper Jr. told an SBI investigator that he observed Cooper Sr. fire the shotgun before Sheehan and Carlisle discharged their firearms at Cooper Sr. See Cooper Dep. 163–65. However, Cooper Sr. testified that his son "is a liar" and that law enforcement officers coerced Cooper Jr. to make this statement. See id.

that [Sheehan's and Carlisle's] conduct amounted to gross negligence." Henry, 652 F.3d at 536–37. Assuming the truth of Cooper Sr.'s account, Sheehan and Carlisle did not simply make "bad guesses in gray areas." Waterman, 393 F.3d at 476 (quotation omitted). Thus, the court denies qualified immunity on summary judgment to Sheehan and Carlisle as to Cooper Sr.'s Fourth Amendment seizure claim. The court also denies defendants' motion for summary judgment on Cooper Sr.'s request for punitive damages against Sheehan and Carlisle under section 1983 with respect to this Fourth Amendment seizure claim. See Cooper v. Dyke, 814 F.2d 941, 948 & n.5 (4th Cir. 1987) (noting that the standards of proof for liability under section 1983 and punitive damages under section 1983 are "essentially the same").

Cooper Sr. also claims that Sheehan and Carlisle, while responding to a reported disturbance, seized Cooper Sr. in violation of the Fourth Amendment simply by tapping on the window and thereby causing Cooper Sr. to go to his door. See Compl. ¶¶ 120–24. This claim fails. See, e.g., Alvarez v. Montgomery Cnty., 147 F.3d 354, 358 (4th Cir. 1998). Cooper Sr. was free to ignore the deputies. See King, 131 S. Ct. at 1862. Therefore, the court grants defendants' motion for summary judgment on this aspect of Cooper Sr.'s Fourth Amendment seizure claim.

2.

Next, Cooper Sr. alleges that Sheehan and Carlisle violated his Fourth Amendment right to be free from unreasonable searches. See Compl. ¶¶ 114–17. Cooper Sr. contends that Sheehan and Carlisle unlawfully searched the Cooper property before they discharged their firearms at him, and that Carlisle unlawfully searched the Cooper residence after the shooting. See id. Cooper Sr. contends that both searches violated his clearly established Fourth Amendment rights. See id.

As for Sheehan's and Carlisle's alleged search of the Cooper property before the shooting, "probable cause is required for a search of the curtilage of a home." Rogers v. Pendleton, 249 F.3d 279, 287 (4th Cir. 2001); see Pena, 316 F. App'x at 313. A home's "curtilage" is "the land immediately surrounding associated with the home." Oliver v. United States, 466 U.S. 170, 180

21

(1984); see Rogers, 249 F.3d at 287. Although a home's curtilage is protected from unreasonable searches, "law enforcement officers [may] enter a person's [yard] without a warrant when they have a legitimate law enforcement purpose for doing so." Alvarez, 147 F.3d at 358; see United States v. Roberts, 467 F. App'x 187, 188 (4th Cir. 2012) (per curiam) (unpublished). However, a police officer's legitimate purpose for entering a home's curtilage must be "unconnected with a search of the premises." Rogers, 249 F.3d at 288. An officer who enters the curtilage of a home through a "normal access route for any visitor to the house" in response to a police report does not unreasonably search the curtilage. See United States v. Robbins, 682 F.3d 1111, 1116 (8th Cir. 2012); Alvarez, 147 F.3d at 357–58.

In making his arguments, Cooper Sr. again relies on Pena. In Pena, the Fourth Circuit held that the officers impermissibly searched the curtilage of plaintiff's home when, after plaintiff initially did not answer their knock on his trailer door, they walked to the area behind plaintiff's trailer and searched structures located there having no reasonable expectation that they would find plaintiff in those structures. See Pena, 316 F. App'x at 314–15.

Pena does not help Cooper Sr. Unlike in Pena, Sheehan and Carlisle came to the Cooper property in response to a reported disturbance. Sheehan and Carlisle entered the property through a normal access route and proceeded to the residence. See Sheehan Dep. 19–20; Carlisle Dep. 25. Although Sheehan and Carlisle initially went to a rear window instead of the main door, Sheehan and Carlisle did not "exceed[] the legitimate reasons for their entry." Rogers, 249 F.3d at 288. Rather, Sheehan and Carlisle entered the curtilage of the mobile home while reasonably attempting to investigate a reported disturbance. See United States v. Moore, 453 F. App'x 401, 403 (4th Cir. 2011) (per curiam) (unpublished); United States v. Taylor, 90 F.3d 903, 909 (4th Cir. 1996).

Alternatively, due to the dark conditions at the Cooper property and the deputies' lack of knowledge about the residence's primary entrance, Sheehan and Carlisle acted reasonably in attempting to gain the attention of the occupants. Unlike in Pena, no evidence suggests that Sheehan

22

and Carlisle impermissibly searched the Cooper property before Cooper Sr. exited the Cooper mobile home. Accordingly, Sheehan and Carlisle did not violate the Fourth Amendment before Cooper Sr. came on to the porch. See, e.g., Alvarez, 147 F.3d at 358.

As for Carlisle's search of the Cooper residence after the shooting, "searches . . . inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980). Nevertheless, exigent circumstances can justify a warrantless search. See Ryburn v. Huff, 132 S. Ct. 987, 990–91 (2012) (per curiam); Brigham City v. Stuart, 547 U.S. 398, 403 (2006); United States v. Jones, 667 F.3d 477, 484 n.8 (4th Cir. 2012). "For police officers successfully to assert the exigent circumstances doctrine, they need only possess a 'reasonable suspicion' that such circumstances exist at the time of the search . . . in question." Figg v. Schroeder, 312 F.3d 625, 639 (4th Cir. 2002). "It is a hallmark of Fourth Amendment jurisprudence that the possibility of a threat to the safety of law enforcement officers may constitute exigent circumstances justifying a warrantless search . . . ." United States v. Legg, 18 F.3d 240, 244 (4th Cir. 1994); see Ryburn, 132 S. Ct. at 990–91; Bellotte v. Edwards, 629 F.3d 415, 422–23 (4th Cir. 2011) (collecting cases). Even when police create the exigency underlying the warrantless search, the exigent circumstances rule still applies as long as the "police do not gain entry to premises by means of actual or threatened violation of the Fourth Amendment." King, 131 S. Ct. at 1862.

Carlisle entered the Cooper residence moments after subduing Cooper Sr. and securing the shotgun. See Sheehan Dep. 19–20; Carlisle Dep. 25. Carlisle entered the residence reasonably certain that there was at least one child, Cooper Jr., and perhaps another adult inside. See Carlisle Dep. 26–27. Based on Cooper Sr.'s exiting the residence armed and the ensuing events, it was reasonable for Carlisle to ensure officer safety by entering the mobile home. See, e.g., Ryburn, 132 S. Ct. at 990–91; United States v. Moses, 540 F.3d 263, 270–71 (4th Cir. 2008). Thus, Carlisle reasonably entered the Cooper residence.

Alternatively, Carlisle entered the Cooper mobile home after he and Sheehan discharged

23

multiple bullets into the Cooper residence and realized that at least Cooper Jr. was inside when he and Sheehan discharged those bullets. See Carlisle Dep. 27. Exigent circumstances to enter a home exist when a law enforcement officer needs "to assist persons [inside the home] who are seriously injured or threatened with such injury." Stuart, 547 U.S. at 403; see Jones, 667 F.3d at 484 n.8. It was reasonable for Carlisle to determine whether any occupant needed medical assistance. Thus, exigent circumstances permitted Carlisle to enter the Cooper residence, and Carlisle's warrantless search of the Cooper residence did not violate the Fourth Amendment.

In opposition to these conclusions, Cooper Sr. alleges that Carlisle entered the Cooper mobile home to search for illegal drugs. See Compl. ¶ 40. However, Cooper Sr. provides no evidence to support this allegation. Moreover, even if Carlisle entered the Cooper mobile home with the secondary motive of searching for illegal drugs, the Supreme Court has "flatly dismissed the idea that an ulterior motive might serve to strip [law enforcement officers] of their legal justification" to conduct a warrantless search. Whren v. United States, 517 U.S. 806, 812 (1996). Therefore, Sheehan and Carlisle did not violate Cooper Sr.'s Fourth Amendment right to be free from unreasonable searches, and the court grants defendants' motion for summary judgment on Cooper Sr.'s section 1983 claims arising out of the search of the Cooper residence.

3.

Cooper Sr. claims that Sheehan's and Carlisle's actions during their seizure of him and the Cooper residence search were racially motivated because he is black. See Compl. ¶¶ 112–19, 147–52. The record, however, contains no evidence to substantiate this race discrimination claim. Therefore, the court grants defendants' motion for summary judgment on this claim. Simmons v. Poe, 47 F.3d 1370, 1379–80 (4th Cir. 1995); see McNeal v. Montgomery Cnty., 307 F. App'x 766, 774 (4th Cir. 2009) (per curiam) (unpublished).

B.

Cooper Sr. asserts claims under section 1983 against Ingram, in his official capacity, and

24

against Hewett in his official and individual capacities, alleging that the sheriff of Brunswick County knowingly failed to adequately train his deputy sheriffs and that this failure establishes the sheriff's deliberate indifference to Cooper Sr.'s federal constitutional rights. See Compl. ¶¶ 80–90.

As for Cooper Sr.'s claim against Ingram and Hewett in their official capacities, "the inadequacy of police training may serve as a basis for [section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Harris, 489 U.S. at 388; see Connick v. Thompson, 131 S. Ct. 1350, 1359–60 (2011); Board of Comm'rs of Bryan County v. Brown, 520 U.S. 397, 408–10 (1997); Doe v. Broderick, 225 F.3d 440, 456 (4th Cir. 2000); Carter, 164 F.3d at 220–21. This conclusion follows because "[t]he way in which a [municipality] chooses to train its police officers is necessarily a matter of policy." Lytle v. Doyle, 326 F.3d 463, 473 (4th Cir. 2003). Thus, to establish a claim under section 1983 for failure to train law enforcement officers, a plaintiff must show that "officers are not adequately trained in relation to the tasks that the particular officers must perform and this deficiency is closely related to the ultimate injury." Id. (quotation omitted); see Harris, 489 U.S. at 390–91; Buffington v. Baltimore Cnty., 913 F.2d 113, 122 (4th Cir. 1990).

To prove this claim

> a plaintiff must demonstrate specific training deficiencies and either (1) that inadequately trained employees engaged in a pattern of unconstitutional conduct, or (2) that a violation of a federal right is a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations.

Smith v. Atkins, 777 F. Supp. 2d 955, 967 (E.D.N.C. 2011) (quotation omitted) (collecting cases); see Connick, 131 S. Ct. at 1360–61. Additionally, a plaintiff must show that the municipality's policy of failing to adequately train law enforcement officers "represents a deliberate choice by the municipality's authorized policymaker to follow a course of action made from among various alternatives." Buffington, 913 F.2d at 122 (quotation and alterations omitted); see Connick; 131 S. Ct. at 1360.

"A claim of inadequate training under section 1983 cannot be made out against a supervisory

25

authority absent a finding of a constitutional violation of the person being supervised." Temkin v. Frederick Cnty. Comm'rs, 945 F.2d 716, 724 (4th Cir. 1991). Thus, the only possible inadequate training claim against Ingram and Hewett arises from Sheehan's and Carlisle's use of deadly force on May 2, 2007.

As for Cooper Sr.'s claim against Hewett in his individual capacity, a supervisor is not liable pursuant to section 1983 in his individual capacity for failing to train unless a plaintiff can establish "proof both of the official's deliberate indifference and of a close affirmative link between his conduct and a resulting constitutional violation by a subordinate." Jones v. Wellham, 104 F.3d 620, 628 (4th Cir. 1997). "A plaintiff may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (quotation omitted).

Even when the evidence is viewed in the light most favorable to Cooper Sr., no reasonable jury could find that the sheriff of Brunswick County failed to adequately train Sheehan and Carlisle in the use of deadly force or that Hewett remained indifferent to "documented widespread abuses" by Sheehan and Carlisle. See Shaw, 13 F.3d at 799. Similarly, no evidence suggests a "close affirmative link" between Hewett's actions as sheriff and those of Sheehan and Carlisle as deputies responding to a reported disturbance at Cooper Sr.'s house. See Jones, 104 F.3d at 628. Rather, the evidence establishes that the sheriff of Brunswick County adequately trained Sheehan and Carlisle. Specifically, Sheehan and Carlisle had to and did complete the Basic Law Enforcement Training ("BLET") program. See Sheehan Aff. [D.E. 50] ¶ 2; Carlisle Aff. [D.E. 51] ¶ 2; see also Sheehan Dep. 10–12; Carlisle Dep. 8–14. The BLET program consists "of 608 hours of academic and physical training covering over [thirty] separate blocks of instruction including . . . the law and constitutional requirements for arrest, search, and seizure[,] . . . criminal investigations[,] firearms use[,] . . . . [and] the use of physical and deadly force by officers." Sheehan Aff. ¶ 2; Carlisle Aff. ¶ 2; see Sheehan Dep. 10–12; Carlisle Dep. 8–14. Additionally, Sheehan and Carlisle completed

26

annual in-service training after joining BCSD and before May 2, 2007, as required by North Carolina law. Sheehan Aff. ¶ 3; Carlisle Aff. ¶ 3. Finally, BCSD provides deputy sheriffs with a manual that outlines standard operating procedures, including procedures for responding to reports like the one received from the 911 dispatcher on May 2, 2007. Carlisle Dep. 12–13. Cooper Sr. offers no evidence to suggest that this manual instructs law enforcement officers to act in an unconstitutional manner. See Gordon v. Kidd, 971 F.2d 1087, 1097 (4th Cir. 1992). Thus, even if Cooper Sr. ultimately proves that Sheehan or Carlisle violated his federal constitutional rights on May 2, 2007, such evidence of a discrete violation cannot prove constitutional inadequacy in the training of Sheehan or Carlisle. See Connick, 131 S. Ct. at 1359–64; Brown, 520 U.S. at 408–10; Harris, 489 U.S. at 388; Carter, 164 F.3d at 218–21; Smith, 777 F. Supp. 2d at 967–68.

In opposition to this conclusion, Cooper Sr. contends that on May 2, 2007, Sheehan and Carlisle did not follow the standard operating procedure set forth in the BCSD manual and that their failures to do so establish that the sheriff of Brunswick County did not adequately train Sheehan and Carlisle. See Pls.' Mem. Opp'n Defs.' Mot. Summ. J. Fed. Claims 19–21. But Cooper Sr. did not provide material from the manual. Thus, the court cannot assess whether Sheehan and Carlisle followed the standard operating procedures on May 2, 2007, and the argument fails.

Alternatively, assuming without deciding that Sheehan and Carlisle did not follow the standard operating procedures set forth in the BCSD manual, Cooper Sr.'s argument still fails. A law enforcement officer's conduct that "deviate[s] from his training is insufficient to render [Brunswick] County's training programs . . . constitutionally inadequate as a general proposition." Guerra v. Montgomery Cnty., 118 F. App'x 673, 676 (4th Cir. 2004) (per curiam) (unpublished). As the Supreme Court repeatedly has recognized, even "adequately trained officers occasionally make mistakes," and those mistakes "say[] little about the training program." Harris, 489 U.S. at 391; see Connick, 131 S. Ct. at 1359–66; Brown, 520 U.S. at 408–10. Here, Cooper Sr. failed to provide any evidence of the constitutional infirmity of the training program beyond the actions of

27

two deputies during one discrete instance. That one alleged failure does not take this case into the so-called single incident municipal liability. See Connick, 131 S. Ct. at 1360–66. Likewise, there is no evidence of documented widespread abuses. Thus, Hewett and Ingram are entitled to summary judgment on this claim.

In sum, the court grants defendants' and Hewett's motions for summary judgment and dismisses Cooper Sr.'s federal claims except for Cooper Sr.'s Fourth Amendment unreasonable seizure claim against Sheehan and Carlisle for their decision to employ deadly force.

## III.

Defendants and Hewett also move for summary judgment concerning Cooper Sr.'s North Carolina law claims. See Defs.' Mot. Summ. J. State Claims [D.E. 44]; Def. Hewett's Mot. Summ. J. [D.E. 54]. The court's subject-matter jurisdiction over Cooper Sr.'s state law claims is governed by 28 U.S.C. § 1367(a), which provides that "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to the claims in the action . . . that they form part of the same case or controversy."

The court first turns to Cooper Sr.'s claims against defendants and Hewett in their official capacities. "The doctrine of sovereign immunity bars actions against public officials sued in their official capacities. Sheriffs and deputy sheriffs are considered public officials for purposes of sovereign immunity." Phillips v. Gray, 163 N.C. App. 52, 56–57, 592 S.E.2d 229, 232 (2004) (citation omitted). Although sovereign immunity may be waived through the purchase of certain insurance policies, see Dalenko v. Wake Cnty. Dep't of Human Servs., 157 N.C. App. 49, 55, 578 S.E.2d 599, 603 (2003), the relevant insurance policy covering defendants and Hewett does not waive sovereign immunity. See Marshall Aff. [D.E. 46], Ex. A, Sec. VI(A). The North Carolina Court of Appeals has construed nearly identical policy language and held that it did not waive sovereign immunity. See, e.g., Estate of Earley v. Haywood Cnty. Dep't of Soc. Servs., 204 N.C. App. 338, 342–43, 694 S.E.2d 405, 409 (2010). Cooper Sr. admits that this North Carolina

precedent is squarely against him. See Pl.'s Resp. Opp'n Mot. Summ. J. State Claims [D.E. 59] 3. Accordingly, the court grants defendants' and Hewett's motions for summary judgment on all state law claims against them in their official capacities.

Next, Cooper Sr.'s claims against Sheehan and Carlisle for assault, battery, negligence, gross negligence, and his request for punitive damages survive summary judgment only to the extent that the claims arise out of the same facts as Cooper Sr.'s Fourth Amendment unreasonable seizure claim. Sheehan and Carlisle are not entitled to public officers' immunity on these claims, at summary judgment, because such immunity is unavailable to a public official who acts with malice. See Bailey, 349 F.3d at 742; Grad v. Kaasa, 312 N.C. 310, 313, 321 S.E.2d 888, 890–91 (1984). An officer acts with malice when he violates an individual's clearly established rights. Bailey, 349 F.3d at 742; see Wilcox v. City of Asheville, 730 S.E.2d 226, 230 (N.C. Ct. App. 2012). In North Carolina, law enforcement officers are entitled to use deadly force when defending against what the officer "reasonably believes to be the use or imminent use of deadly physical force." N.C. Gen. Stat. §15A-401(d)(2)(a). As discussed, genuine, material factual disputes exist concerning Sheehan's and Carlisle's use of deadly force. A jury needs to resolve these factual disputes before reaching a conclusion about reasonableness, and by extension whether Sheehan and Carlisle acted with malice. The merits of Cooper Sr.'s assault, battery, negligence, and gross negligence claims are tied to the reasonableness of Sheehan's and Carlisle's actions.[7] Cooper Sr.'s state law request for punitive damages also survives pending the determination of whether Sheehan and Carlisle acted with malice. See N.C. Gen. Stat. §1D-15. Accordingly, the court denies summary judgment on these claims against Sheehan and Carlisle to the extent that the claims concern the alleged unreasonable seizure

---

[7] Public officers, which include deputy sheriffs, generally cannot be personally liable for mere negligence while performing their governmental duties. Isenhour v. Hutto, 350 N.C. 601, 609–10, 517 S.E.2d 121, 127 (1999); Marlowe v. Piner, 119 N.C. App. 125, 128, 458 S.E.2d 220, 222–23 (1995). However, if official immunity is determined at trial to be unavailable because the officer acted "maliciously," then Cooper Sr. may recover from Sheehan and Carlisle for negligence. See Wilcox, 730 S.E.2d at 238.

of Cooper Sr. See Pena, 316 F. App'x at 319; Rowland v. Perry, 41 F.3d 167, 174 (4th Cir. 1994).

The court grants defendants' and Hewett's motions for summary judgment for Cooper Sr.'s claims directly under the North Carolina Constitution because the tort claims are an adequate remedy. See, e.g., Wilcox, 730 S.E.2d at 236–37. The court also grants defendants' motion for summary judgment with respect to Cooper Sr.'s claims for invasion of privacy and trespass to real property. As discussed, Sheehan and Carlisle walked to the rear window and main entrance of the Cooper residence while responding to a disturbance call at the address. "Entrance onto private property [by law enforcement] for the purpose of a general inquiry or interview is proper." State v. Prevette, 43 N.C. App. 450, 455, 259 S.E.2d 595, 599–600 (1979); see State v. Lupek, 712 S.E.2d 915, 919 (N.C. Ct. App. 2011). It does not constitute trespass. See Lupek, 712 S.E.2d at 919. Here, Sheehan and Carlisle did not trespass when they approached the residence to investigate the reported disturbance. Likewise, Sheehan and Carlisle did not unreasonably invade Cooper Sr.'s privacy by tapping on a window to alert the residence's occupants of their presence while they walked to the back door. The same conclusion holds true even if Sheehan attempted to or did peer into a window.

The court grants defendants' motion for summary judgment on Cooper Sr.'s claim for damage to property. Cooper Sr., however, may seek to recover for damage to the Cooper residence from Sheehan and Carlisle as part of his surviving state law tort claims. See Kawai Am. Corp. v. Univ. of N.C. at Chapel Hill, 152 N.C. App. 163, 167, 567 S.E.2d 215, 218 (2002).

Finally, the court grants defendants' and Hewett's motions for summary judgment on Cooper Sr.'s civil conspiracy claim. Cooper Sr. alleges only that defendants and Hewett conspired to have Crocker present erroneous information to the grand jury concerning the events of May 2, 2007, resulting in the indictment of Cooper Sr. See Compl. ¶ 178. However, no rational jury could find such a civil conspiracy. Moreover, and in any event, the intracorporate conspiracy doctrine bars this claim. See, e.g., State ex rel. Cooper v. Ridgeway Brands Mfg., LLC, 184 N.C. App. 613, 625–26, 646 S.E.2d 790, 799 (2007) (applying the intracorporate conspiracy doctrine to a claim under North

30

Carolina law), aff'd in part & rev'd in part on other grounds, 362 N.C. 431, 666 S.E.2d 107 (2008); accord Buschi v. Kirven, 775 F.2d 1240, 1251–54 (4th Cir. 1987); Iglesias v. Wolford, 539 F. Supp. 2d 831, 835–36 (E.D.N.C. 2008). Furthermore, in North Carolina, "[a] civil action may not be maintained for a conspiracy to give false testimony." Hawkins v. Webster, 78 N.C. App. 589, 592, 337 S.E.2d 682, 684 (1985); cf. Rehberg v. Paulk, 132 S. Ct. 1497, 1506–07 (2012) (a grand jury witness has absolute immunity from any claim under section 1983 based on the witness' testimony and "this rule may not be circumvented by claiming that a grand jury witness conspired to present false testimony or by using evidence of the witness' testimony to support any other [section] 1983 claim concerning the initiation or maintenance of a prosecution"). Thus, Cooper Sr.'s civil conspiracy claim fails.

IV.

In sum, the court DENIES defendants' motion for summary judgment [D.E. 47] as to Cooper Sr.'s federal claim against Sheehan and Carlisle under section 1983 and the Fourth Amendment for unreasonable seizure (portions of claims 1, 10, 11), and for punitive damages (claim 16). The court GRANTS defendants' and Hewett's motions for summary judgment [D.E. 47, 54] as to all other federal claims (claims 2, 6, 7, 12). The court DENIES defendants' motion for summary judgment [D.E. 44] as to Cooper Sr.'s state law claims of assault, battery, negligence, and gross negligence against Sheehan and Carlisle for their use of force against Cooper Sr. (portions of claims 3, 14), and for punitive damages (claim 17). The court GRANTS defendants' and Hewett's motions for summary judgment as to all other state law claims (claims 4, 5, 8, 9, 13, 15, 18). Cooper Jr. is DISMISSED as a plaintiff, Hewett is DISMISSED as a defendant, and all other defendants except Sheehan and Carlisle are DISMISSED as defendants.

SO ORDERED. This 27 day of September 2012.

JAMES C. DEVER III
Chief United States District Judge